Petition of Canal Barge Company, Inc., as Owner and Operator of the M/V ELAINE JONES, Praying For Exoneration From or Limitation of Liability.

CANAL BARGE COMPANY, INC., Petitioner-Appellant-Cross Appellee,

v.

Mary Kathryn GRIFFITH, Individually and as Administratrix of the Estate of George L. Griffith, Deceased, Respondent-Appellee-Cross Appellant,

Terminal Railroad Assoc. of St. Louis et al., Respondents-Appellees.

No. 71–2226.

United States Court of Appeals, Fifth Circuit.

March 30, 1973.

Rehearing and Rehearing En Banc Denied June 18, 1973.

Robert B. Acomb, Jr., New Orleans, La., Douglas C. Wynn, Greenville, Miss., for petitioner-appellant.

Harry E. Barsh, Jr., Lake Charles, La., Clayton J. Swank, III, Greenville, Miss., Elmer Price, St. Louis, Mo., for respondents-appellees.

Frank S. Thackston, Jr., J. A. Lake, Greenville, Miss., for Terminal Railroad Ass'n. of St. Louis.

Before GODBOLD and RONEY, Circuit Judges, and BOYLE, District Judge.

GODBOLD, Circuit Judge:

This case arises from a collision on October 14, 1969 between the M/V *Elaine Jones*, a towboat owned and oper-

ated by Canal Barge Company, Inc. (Canal), and the Eads Bridge, a fixed structure that spans the Mississippi River at St. Louis, Missouri. The impact caused extensive damage to the bridge and resulted in the death of the towboat pilot, George L. Griffith. Eads Bridge is owned by St. Louis Bridge Company and operated by Terminal Railroad Association of St. Louis.

Canal filed a petition seeking exoneration or limitation of liability. In response, Mary Kathryn Griffith, as personal representative of the decedent,[1] claimed money damages for the death of her husband; Terminal sought recovery for damages to the bridge and loss of revenue; and two other corporate claimants made demand for minor property damage. Canal counterclaimed for indemnity from the Griffith estate claiming that negligence of Griffith was the proximate cause of the mishap.

The District Court found that Canal was negligent through its employees, that the *Elaine Jones* was unseaworthy, that Canal's negligence proximately caused the collision and the unseaworthiness proximately contributed thereto, and that Griffith was not negligent. Accordingly, the court held Canal liable for damages to all claimants. Canal appeals, claiming error with respect to liability and damages, both as to Terminal and to Mrs. Griffith. Mrs. Griffith cross appeals with regard to the amount of damages awarded and elements of damage allegedly omitted. We affirm with respect to Canal's liability to Terminal and to Mrs. Griffith, and with respect to the damages due Terminal. We reverse with respect to damages due Mrs. Griffith and with respect to her husband's contributory negligence.

We focus on four areas of inquiry: (I) liability as between Canal and Terminal; (II) liability as between Canal and Mrs. Griffith; (III) damages due Terminal; (IV) damages due Mrs. Griffith on behalf of George Griffith's beneficiaries designated by pertinent statutory and general maritime law.

We set out the facts needed to understand our disposition.[2]

The *Elaine Jones*, a 5300 horsepower diesel towboat, was manned by Captain Stroschein, pilot Griffith, and eight support personnel. Stroschein boarded the *Elaine Jones* as pilot on Sept. 29, 1969. His previous experience included piloting similar towboats of 4300 horsepower, but his regular employment was as master of an 1800 horsepower vessel. When Griffith came aboard on Oct. 7, Stroschein became master and Griffith pilot. The two had never served together before. Griffith regularly piloted a sister vessel of the *Elaine Jones*, identical in dimension but having 1000 less horsepower.

The *Elaine Jones* passed northbound through St. Louis Harbor on Oct. 9 when the Mississippi River gauge was 4.7 feet, well below flood stage of 30 feet. It operated north of St. Louis for several days, then proceeded back downriver with seven empty barges. At Wood River, Illinois, just north of St. Louis, while Captain Stroschein was on watch, one empty and two loaded barges were added to the tow and the entire ten-barge tow rearranged. With Captain Stroschein still at the controls, the *Elaine Jones* departed Wood River heading south pushing the tow. Shortly before noon when Griffith was due to relieve Stroschein at the wheel, the *Elaine Jones* arrived at Lock 27, located at Mile 185, five miles north of Eads Bridge. Griffith took over from Stroschein at 11:45 a. m. and left Lock 27 five minutes later.

---

1. The District Court concluded that, as administratrix of George L. Griffith's estate, Mary Kathryn Griffith had standing to sue under both the Jones Act and the general maritime law. See 45 U.S.C. §§ 51, 59; 46 U.S.C. § 688; Lindgren v. U. S., 281 U.S. 38, 50 S.Ct. 207, 74 L. Ed. 686 (1930); Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

2. Exhaustive findings of fact detailing with precision every aspect of the collision and damages appear in the District Court's opinion reported at 323 F.Supp. 805.

In the interval between the *Elaine Jones'* upriver passage through St. Louis Harbor on Oct. 9 and its departure from Lock 27 on Oct. 14, and as a result of heavy rainfall, the river at the harbor had risen precipitously to 30.3 feet, just above flood stage of 30 feet, a fact known to both pilot and master.

The physical facts concerning St. Louis Harbor, and the effects of high water are well described by the District Court.

3. St. Louis Harbor, the site of this accident, because of the presence of six river bridges, their close proximity and construction, coupled with the meander of the river and its currents, enjoys a reputation among river people of being a difficult area or passage to safely navigate, particularly in high water. A vessel southbound, as was the *Elaine Jones*, after departing Lock 27, is first confronted with the Merchants Bridge (Mile 183), and then the McKinley Bridge (Mile 182.-5), which present limited horizontal clearance. Immediately after passing the McKinley Bridge, the vessel must line up for safe passage of the Veterans Bridge (Mile 180.2) and then the Eads Bridge (Mile 180). Just downriver from the Eads Bridge are the Poplar Street Bridge (Mile 179.3) and the MacArthur Bridge, also known as the "City" bridge (Mile 179). For southbound traffic, a gradual bend in the river from left to right occurs above the Veterans Bridge and extends to below the MacArthur Bridge. Contributing to the navigation problem is the presence of Eads Bridge which, due to its arched construction, affords a limited amount of clearance in high water through which vessels can safely pass. Also, during high water, i. e., 20 feet or more on the St. Louis gauge, the current immediately above Veterans Bridge runs from the right descending bank to the left descending bank, from the Missouri shore toward the Illinois shore. This high water current condition, called a left-hand "set" or "draft", has a pronounced effect of moving a southbound boat and tow toward the Illinois bank rather than straight ahead. These navigation conditions exist whenever the river is at 20 feet or more on the St. Louis gauge and are facts known to experienced mariners navigating towboats through that section of the Mississippi River.

\* \* \* \* \* \*

5. \* \* \* As the river stage exceeds 20 feet, the force of the aforementioned set to the left above Veterans Bridge likewise increases; and also as the rate of rise in the river accelerates, the force of the set becomes more violent. Although a sudden rise of the river increases the severity of the set, this is an operating factor known to persons experienced in navigating St. Louis Harbor during high water. Moreover, the experienced navigator of a downbound vessel can reasonably predict the severity of current in St. Louis Harbor by observing upriver conditions at Wood River, Illinois, and water levels at Lock 27.

6. The above left set or cross-current is not encountered by downbound vessels except in high water. At all other times the current in the immediate area runs straight down the river. When navigating the harbor downbound in low water (10 feet or less), it is an acceptable practice for a vessel to approach the Veterans and Eads Bridges in line with their green lights and pass under both along the mid-channel sailing line, as depicted on the U.S. Engineers' official chart (Ex. 13). See App. A. This sailing line is the normal low water configuration for passage of a descending vessel. When navigating the harbor downbound in high water, it is the commonly accepted practice, in order to compensate for the left hand set encountered just above Veterans Bridge, to approach Veterans Bridge well to the right of the mid-channel sailing line, or favoring the Missouri shore. By this means, the vessel and tow are not forced by the cross-current to the

left of the mid-channel sailing line, as it runs immediately beneath both the Veterans and Eads Bridges. Thus, a downbound vessel and tow that in high water approach the Veterans and Eads Bridges within one-quarter of a mile north of Veterans Bridge on the mid-channel sailing line are too wide or "out of shape" to safely navigate the passage beneath the two bridges. 323 F.Supp. at 808–809.

Before the towboat's departure from Lock 27, Stroschein spoke briefly to Griffith without issuing any instructions for navigating St. Louis Harbor, and then left the wheelhouse for the galley. Stroschein returned at 12:10 p. m., at which time the head of the tow was more than a mile above Veterans Bridge, or approximately half way between McKinley Bridge, mile 182.5, and Veterans Bridge, mile 180.2. Stroschein noted without comment that Griffith had set the *Elaine Jones* on the mid-channel sailing line, the course to be followed under normal river conditions. At that time the vessel had not yet reached the fail-safe point, that is, the point in the river beyond which correcting the course to a heading proper under the extraordinary conditions would be too late to avoid almost certain mishap. Still the captain said nothing about the river conditions or the course to be followed nor did he assume command. Pilot Griffith continued on the mid-channel sailing line past the fail-safe point and until the head of the tow reached about one-quarter mile north of Veterans Bridge. At this juncture the left hand set in the river was encountered, pushing the vessel and tow violently to the left and toward the left descending channel and the left pier of Veterans Bridge. The pilot took measures to attain a proper heading, but his efforts were to no avail. It was only when the towboat was about 100 feet above Veterans Bridge (at which time most of the tow would have passed under that

bridge) that Captain Stroschein first became alarmed.

The *Elaine Jones* bumped the river pier of Veterans Bridge, causing some of the tow wires to part and the tow to jack-knife. Stroschein abandoned the wheelhouse when he realized a collision with Eads Bridge was unavoidable, but Griffith remained to maneuver the vessel off the Eads Bridge pier toward which it was headed. The towboat missed the pier, but seconds later the wheelhouse struck the bottom portion of Eads Bridge. Griffith left the controls immediately prior to impact but was crushed by falling metal and killed instantly. Everyone else escaped.

I. Liability as between Canal and Terminal.

■ The District Court correctly held that, in the absence of sufficient proof in rebuttal, presumption of fault attaches to a moving vessel which collides with a fixed object and makes a prima facie case of fault against the vessel. The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895); Brown & Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724 (5th Cir. 1967).

Canal attempted to meet its burden in part by showing that Eads Bridge was constructed in such manner as to violate the Act of Congress authorizing its erection,[3] and it therefore constituted an obstruction to navigation, the maintenance of which was negligent and a proximate cause of the collision. This argument, the District Court found, rested on an erroneous construction of the statute.[4] We perceive no error in that court's construction and cannot add profitably to its discussion.

■ The District Court correctly held the defense of inevitable accident to be inapplicable.[5] "Inevitable accident" is not as much a true defense as it is a convenient label expressing the idea that once a presumption of negligence arises

3. 14 Stat. 246 (1866), as amended, 15 Stat. 123 (1868).

4. 323 F.Supp. at 822–823.

5. 323 F.Supp. at 819.

the burden shifts to the presumptively negligent party to come forward with proof that the accident in no way resulted from its own lack of due care. Atkins v. Lorentzen, 328 F.2d 66, 69 (5th Cir. 1964); Gilmore & Black, The Law of Admiralty § 7–2, at 397 (1957). As will be seen from part II, below, Canal failed to carry its burden of showing that none of its personnel—captain, pilot, or shore captain in radio contact—was remiss in doing "everything which an experienced mariner could do, adopting ordinary caution." The Union S.S. Co. v. The New York & Virginia S.S. Co., 65 U.S. 307, 313, 16 L.Ed. 699, 701 (1861).

## II. Liability as between Canal and Mrs. Griffith.

Canal was found liable to Mrs. Griffith as personal representative on the basis of the Jones Act, 46 U.S.C. § 688, and the general maritime law, Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

■ The findings of negligence on the part of Canal may be quickly dealt with. We review them under the "clearly erroneous" rule, McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954), which requires they be affirmed.

Stroschein, the towboat captain, was found wanting in due care in the following particulars: (a) tendering to his pilot a tow without affording him an opportunity to get the feel of the tow before encountering unusual river conditions which the master knew were hazardous to navigate; (b) failing to inform his pilot of a hazard to navigation of which he had knowledge; (c) failing to instruct his pilot as to the proper method of navigating St. Louis Harbor under known hazardous conditions; (d) failing to take charge when the pilot plainly misgoverned the vessel; (e) abandoning the wheelhouse in the face of danger.

Finding (b) is so obviously correct as to require no comment.

As to (a), on the basis of clear and competent expert testimony, the District Judge found that it takes "some minutes" after the vessel reaches full speed for an experienced pilot to get the feel of a particular tow arrangement. The arrangement had been made up while Captain Stroschein was on watch, and Griffith, handling the tow for the first time, had been piloting for only a few minutes when he came into the difficult passage of St. Louis Harbor. These findings dispose of the contention of Canal that the pilot had the feel of his tow from his prior experience.

Regarding (c), the court found that Stroschein was aware of the hazardous conditions in the harbor, having himself previously piloted vessels safely through the area at high water. Also the court heard testimony that every pilot was familiar with the dangerous condition caused by high water.

There can be no real dispute over conclusion (d), and Canal has not contended otherwise, that the captain was negligent in failing to take charge when the pilot plainly misgoverned the vessel.

Canal questions conclusion (e), Stroschein's negligence in abandoning the wheelhouse, by the unpersuasive argument that since Griffith was not negligent in fleeing seconds after Stroschein, the captain's earlier departure could not have been an act lacking the requisite care. In the interval between the captain's and the pilot's departures, Griffith, by remaining, managed to maneuver the vessel sufficiently to avoid a potentially more serious collision with the pier of the bridge. The court was justified in inferring that the captain's presence might have aided in minimizing the disaster.

■ The trial court also found Canal negligent because its port captain failed to warn the master and pilot of the navigational hazards of St. Louis Harbor although he had "privity or knowledge" of such hazards. The port captain is located at Canal's shore facility at Natchez, Mississippi, which had twice daily radio

---

**Page 19**

contact with the *Elaine Jones* and Canal's other vessels. During October 10–14, when the *Elaine Jones* was operating just above St. Louis Harbor, other Canal vessels were in the vicinity and in daily radio communication with Natchez, which was aware of the unusual rise in the river in the St. Louis area and the flood conditions existing. The conclusions of the District Court are not clearly erroneous.[6]

■ The *Elaine Jones* was found to be unseaworthy in these respects: "(a) Her master *and pilot* were unfit to meet the perils reasonably to be anticipated in her voyage through St. Louis Harbor. . . . (b) Her master *and pilot* were unequal in disposition and seamanship to the ordinary man in the calling under like circumstances. . . ." which unseaworthy condition proximately contributed to the accident. 323 F.Supp. at 820 (citations omitted) (emphasis added). Under the plainly erroneous rule this is to be affirmed.

■ The findings concerning unseaworthiness, insofar as they relate to Griffith, lead us into discussion of the point most strenuously urged by Canal, which is that Griffith negligently chose his course through St. Louis Harbor, which negligence caused or contributed to the accident, and that findings to that effect are required by the finding that unseaworthiness was predicated in part on Griffith's insufficiency as a pilot. It is perhaps an overstatement that a finding of unseaworthiness requires in all cases a finding of contributory negligence.[7] We do, however, conclude that application of the correct legal standard to the facts found by the District Court requires in this case a conclusion that Griffith was guilty of some negligence and that his negligence was a proximate cause of the collision. We leave to the District Court on remand the determination of the extent of Griffith's negligence and its comparative contribution to his death.

This necessary conclusion of negligence on Griffith's part is significant in at least two respects. Canal claims that negligence by Griffith is a basis for recovery over by it, in whole or in part, against Griffith for damages due Terminal from Canal. Additionally, while not a complete defense to the Griffith claim insofar as it is based on unseaworthiness, the finding of contributory negligence is a proper factor to be considered in fixing the amount of recovery. Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94 n. 11, 66 S.Ct. 872, 90 L.Ed. 1099, 1105–1106 n.11 (1946); Manning v. M/V Sea Road, 358 F.2d 615 (5th Cir. 1965); Cox v. Esso Shipping Co., 247 F.2d 629 (5th Cir. 1957). The same is true under the Jones Act.

6. United States Steel Corp. v. Fuhrman, 407 F.2d 1143 (6th Cir. 1969), cert. denied, 398 U.S. 958, 90 S.Ct. 2162, 26 L.Ed.2d 542 (1970), and United Geophysical Co. v. Vela, 231 F.2d 816, 819 (5th Cir. 1956), are not to the contrary. In those cases the concern was with whether persons far from the scene should have issued orders in conflict with or countermanding orders of the master on the scene and in an emergency. Here the issue is whether instructions should have been given before an emergency arose.

7. In Waldron v. Moore-McCormack Lines, 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967), at trial the petitioner's sole contention had been "that the mate's assignment of two men to do the work of three or four constituted negligence and made the vessel unseaworthy." Id. at 725, 87 S.Ct. at 1411, 18 L.Ed.2d at 484. The jury found no negligence, and the court directed a verdict for respondent on the unseaworthiness issue. On appeal the Supreme Court remanded to provide petitioner an opportunity to present his theory of unseaworthiness to the jury. Unless we were to assume that the Court's remand served only to engage the jury in pointless exercise, by allowing it to give only a negative answer to the inquiry whether the vessel was rendered unseaworthy by the mate's nonnegligent act, the Court's disposition indicates that findings that one person's acts are both nonnegligent and the cause of unseaworthiness are not legally irreconcilable.

Under the authorities which we discuss below, Griffith was negligent in pursuing an unreasonably dangerous course if he possessed either actual knowledge of hidden dangers or constructive knowledge chargeable to him as a matter of law. It is clear that Griffith knew of the high water level, and the court found that he did and also found that he knew that Eads Bridge had only limited clearance, making it necessary to pass beneath the center of its channel span. But the court concluded that Griffith did not know of the hazard to navigation caused by high water and consisting of the left hand set to the current directly above Veterans Bridge. Canal correctly points out that Griffith had piloted a similar towboat southbound through St. Louis Harbor on previous occasions. But the court found that the evidence did not reveal that on any of those occasions high water conditions existed.[8] On adequate evidence the court also concluded that neither Captain Stroschein nor Canal's other supervisory personnel informed Griffith of the leftward current at high water. The finding of lack of actual knowledge of the particular hazard is, therefore, not plainly erroneous.

We turn then to consideration of whether as a matter of law Griffith was chargeable with knowledge, that is, whether he is required to suffer the legal consequences of knowledge although he did not actually possess it. These facts found by the court bear on that determination: "experienced mariners navigating towboats through that section of the Mississippi River" knew that the set occurred when the river gauge was above 20 feet, but Griffith did not know of the set; Griffith had seven years experience in piloting vessels of other towing companies on various rivers, including the Mississippi; Griffith had piloted through St. Louis Harbor southbound at least four times; Griffith

had never piloted a vessel through this area at high water, but Stroschein had; a sudden rise in the water increases the severity of the set, a fact known "to persons experienced in navigating St. Louis Harbor during high water." The court entered this conclusion of law:

> There being no evidence that the deceased pilot was aware of the set or cross-current at flood stage or in high water just above Veterans Bridge, based on his prior experience or knowledge, Griffith *may not be presumed to have been personally negligent.* Thus, he cannot be held contributorily negligent for the improper navigation and no diminution of damages on account of comparative negligence may be made in the death award.

323 F.Supp. at 822 (emphasis added).

"[T]hose who undertake any work calling for special skill . . . are required not only to exercise reasonable care in what they do, but also to possess a standard minimum of special knowledge and ability." Prosser, Law of Torts § 32, at 164. In Atlee v. The Nw. Union Packet Co., 88 U.S. (21 Wall.) 389, 22 L.Ed. 619 (1875), a barge collided with a stone pier built into a river, and suit was brought in admiralty by the barge owner for recovery. The District Court found mutual fault on the part of the pier owner and the barge's pilot, but the Court of Appeals reversed in part, finding no fault on the part of the pilot. The Supreme Court reversed and held that the pilot was at fault. It observed: "[T]he pilot of a river steamer . . . is selected for his personal knowledge of the topography through which he steers his vessel. . . . He must know where the navigable channel is . . . . He must also be familiar with all dangers that are permanently located in the course of the river. . . . To do this he must be con-

---

8. There was evidence that on four of those passages high water conditions did not prevail and on the fifth, when they did, it was not clear that the passage took place during Griffith's watch. Indeed the most reasonable inference is to the contrary.

stantly informed of changes in the current of the river, of sand-bars newly made, of logs or snags, or other objects newly presented against which his vessel might be injured." *Id.* at 396, 22 L.Ed. at 621. The Court acknowledged that it was exacting a very high order of ability. The pilot had been absent for a year and thus did not know what "[a]ny pilot who, during the navigable season of the year 1870, was engaged in conveying vessels up and down the Mississippi River past Fort Madison, would have known . . . ." *Id.* at 397, 22 L.Ed. at 622. The Court noted that after so long an absence the pilot should make a few trips with other pilots more familiar with the river. It concluded that "there was such want of knowledge and skill in the pilot, and such want of care in his management of his vessel at that point" as to lead to the conclusion that the pilot was at fault. *Id.* at 398, 22 L.Ed. at 622. In summary, a pilot was held to have a duty to perform his functions with the skill and knowledge of an ordinary Mississippi River pilot recently familiar with the area. In failing to inform himself of the changes an ordinary pilot would expect, and in acting without such knowledge, the pilot did not fulfill his duty.

Davidson S.S. Co. v. United States, 205 U.S. 187, 27 S.Ct. 480, 51 L.Ed. 764 (1907), was a collision case tried to a jury. The defendant steamship company was found liable for damages to a recently extended government pier in Lake Superior, caused when its ship collided with the pier. The Court viewed the question before it as "whether there was testimony from which the jury might rightfully find the defendant guilty of negligence." *Id.* at 193, 27 S.Ct. at 482, 51 L.Ed. at 767. The pilot had been on the lake for many years, but he had not been in the particular harbor for over a year. He knew that harbor improvements were being made on the lake and that information circulars were available. The Court said: "[T]here is an obligation on all persons to take the care which, under ordinary circumstances of

the case, a reasonable and prudent man would take, and the omission of that care constitutes negligence." *Id.*, 27 S. Ct. at 483. Following this statement of obligation was the passage from *Atlee* describing the degree of knowledge required of a river pilot. The Court concluded: "His very want of knowledge, when he had the means of ascertaining the facts, could properly be regarded as negligence. Clearly, it could not be held as matter of law not to be so." *Id.* at 194, 27 S.Ct. at 483, 51 L.Ed. at 767. Negligence thus consisted of the pilot's failure to inform himself when information was available about conditions regarding which an experienced pilot would have reason to desire information.

In The Severance, 152 F.2d 916, (4th Cir. 1945), cert. denied, Stone v. Diamond, 328 U.S. 853, 66 S.Ct. 1344, 90 L. Ed. 1626 (1946), the factual cause of the collision was a freshet in the river, which made the ship take a sudden sheer. The lower court found no neglect by the pilot. The Fourth Circuit reversed, holding:

> We must presume here that Captain Dosher either knew, or by the exercise of reasonable care should have known, of the prevailing conditions on the Cape Fear River. By undertaking to act as pilot of the "Severance," he promised the skill of his art.

*Id.* at 920.

Utility Service Corp. v. Hillman Trans. Co., 244 F.2d 121 (3d Cir. 1957), is factually very similar to the instant case. As a towboat in the Ohio River passed through one of two channels created by the presence of an island in midstream it collided with a stationary barge as a result of a crosscurrent for which the pilot had not compensated. There was evidence from which it could have been found that the opening of a dam upriver increased the current and that this effect was readily noticeable to experienced mariners. Under normal conditions the current deflected slightly at the island, causing crosscurrents that became noticeable as the river's rate of

flow increased. The pilot knew of such crosscurrents when the main current increased, but he did not know of the particular crosscurrent that caused the collision "because I had no previous experience of going that close to the island, in current." *Id.* at 123 (emphasis deleted). The court affirmed the conclusion that the pilot was negligent in risking passage between the island and the equipment, a course he had never before taken in swift water, considering that there was an alternative manner of passage. It said:

> Appellant's pilot should have been aware of the crosscurrent, for the law imposes a duty upon him to be "constantly informed of changes in the current of the river" and the "changes made by the hand of man or the action of the elements in the path of his vessel." Davidson Steamship Co. v. United States, 1907, 205 U.S. 187, 194, 27 S.Ct. 480, 483, 51 L.Ed. 764. Rivers are not immutable. Rains swell their volume; the opening of dams increase their current; deposits of silt may change their depths; wrecks may obstruct them. Where the river pilot has the means of obtaining information concerning these changes, he is deemed in law to know them. If he tests the danger of increased current at a place where his common sense and nature's physical laws would tell him that a crosscurrent would embarrass his progress, he does so at his own risk.

*Id.* at 124.

The foregoing authorities, applied to the findings of fact made in the present case, require the conclusion that the pilot was guilty of contributory negligence as a matter of law. He knew of the high water level. The court found that the particular current conditions existing at St. Louis Harbor under circumstances of high water were known to experienced pilots and that Griffith was an experienced pilot. As such, he was required to inform himself of special current conditions arising from circumstances known to him. Atlee v. The Nw. Union Packet Co., *supra.* Thus, while specifically charging the master with knowledge of all navigational conditions reasonably ascertainable by mariners experienced in navigating St. Louis Harbor at flood stage, the court absolved Griffith of negligence because it considered him not chargeable with the same body of knowledge because he was not experienced in navigating the harbor at flood stage. The foregoing authorities make clear that this was an incorrect conclusion.

 Appellee Griffith characterizes the statement of a pilot's duty as a presumption (supported in this to some degree by the District Court's Conclusion of Law, *supra*) which can be relied upon only where the employer's liability to a third party is in issue, and not between employer and employee. But the facts in *Hillman* make clear that knowledge is not merely a fact presumed and rebuttable by evidence that the fact was not known. Secondly, it seems to us to make no difference that the failure of duty is asserted by employer against employee. Where the seaman fails to perform his own legal obligation concurrently with other failures of the employer, and as a consequence of the concurrent failures an accident occurs causing injury or death to the seaman, the seaman's failure can be reflected as an offset to his recovery. This is plain vanilla comparative negligence, a result not proscribed by the special status of seamen as wards of admiralty. The particular respect in which the pilot is negligent has no bearing on the determination of who should bear the loss as between negligent pilot and employer. The crucial factor is not that the pilot failed to discover a fact he should have known, as opposed, for example, to his having known all he should but oversteering; it is that the pilot in some manner did not meet his legal duty. Cf. Symonette Shipyards, Ltd. v. Clark, 365 F.2d 464, 470 (5th Cir. 1966), cert. denied, 387 U.S. 908, 87 S.Ct. 1690, 18 L.Ed.2d 625 (1967).

■ An additional factor present in this case and not in those discussed above is that the pilot whose knowledge was insufficient was acting under the command of another whose knowledge was commensurate to that of the ordinary pilot and who did not tell the pilot what he should do. Appellee maintains this prevents Griffith's being contributorily negligent. We do not reach in this case the question of whether if Griffith had asked if there was anything of special nature he should know or do in light of high water conditions, and had been given an answer on which he relied, he would have fulfilled his duty. In the absence of inquiry by Griffith, Stroschein's failure to discharge his duty to inform the pilot bears on whether Stroschein was negligent, but it does not insulate Griffith from the consequences of his own breach of duty. Griffith's duty to possess himself of essential knowledge existed independently of whether there was present another employee who by reason of his superior rank had a duty to inform Griffith. Stroschein had a duty to tell without being asked. Griffith had a duty to ask (of Stroschein or from other sources). The duty of each did not negative the duty of the other or excuse failure of the other to carry out his duty.

Canal Barge claims that if Griffith was negligent it is entitled to at least some degree of indemnification from Griffith for damages due to Terminal. Canal appears to be proceeding on a tort indemnity theory rather than an actual or implied contract. Griffith contends as a general proposition that in a collision case in admiralty the employer-shipowner cannot seek indemnity from its employee-pilot for damages caused to a third party and resulting from the pilot's negligence. No admiralty cases are cited to us in which indemnity was either permitted or forbidden in such circumstances. But see Tri-State Oil Tool Indus. Co. v. Delta Marine Drilling Co., 410 F.2d 178 (5th Cir. 1969) a suit in admiralty; Restatement of Resti-tution § 96 (1937); Restatement of Agency (Second) § 401 (1958), particularly comment d. *See also* Rodriquez v. United States Lines Co., 181 F.Supp. 95 (S.D.N.Y.1960) and The Providence, 293 F. 595 (D.R.I.1923), in which the substance of the indemnity question was not reached but the court permitted the ship or shipowner to implead its pilot or other employee-crew member whose negligence was claimed to be the sole basis for liability of ship or owner. We reach no conclusion and intimate no views on the indemnity question which must be first considered by the trial court.

### III. Damages due to Terminal.

Canal has mounted a broad assault on the damages awarded to Terminal. The damages fall into these categories: (1) loss of toll revenue attributable to automobile traffic across Eads Bridge; (2) loss of revenue from passenger train traffic; (3) additional costs incurred in routing and manning over the city's toll bridge trains normally carried by Eads; (4) Eads repair costs. With respect to the first three categories Canal's objections narrow down with few exceptions to the single assertion that the lower court's findings are clearly erroneous.

■ (1) *Auto tolls.* Terminal set out to prove loss of auto tolls by introduction of business records indicating vehicle revenues earned by Eads during comparable periods before and after the accident. See South Carolina State Highway Dept. v. United States, 78 F. Supp. 598 (E.D.S.C.), aff'd, 171 F.2d 893 (4th Cir. 1948). Of course, no two time periods are free of differences that may significantly affect bridge usage. In this case during the entire repair period vehicular traffic over Eads was restricted to two lanes of the four ordinarily available. Also, before Eads resumed full operation, new egresses into downtown St. Louis were opened from a nearby free interstate highway, tending to divert traffic from the bridge. Appellant has referred us to other factors as well that may have caused the esti-

mate of loss attributable to Canal to fall short of perfection. However, this circuit has indicated that to allow a tortfeasor to avoid paying damages because such damages were to some necessary extent imperfectly established would be unjust and unbearable. ABC-Paramount Records, Inc. v. Topps Record Distributing Co., 374 F.2d 455 (5th Cir. 1967). There we relied upon Bigelow v. RKO Radio Pictures, 327 U.S. 251, 264, 66 S.Ct. 574, 580, 90 L.Ed.2d 652, 660 (1946), in which the Supreme Court noted that in those cases where exact loss is unascertainable, a just and reasonable estimate of the damage based on relevant data may be made and the verdict rendered accordingly. See Hartley & Parker, Inc. v. Florida Beverage Corp., 307 F.2d 916 (5th Cir. 1962). Daniels Towing Serv., Inc. v. Nat Harrison Assoc., Inc., 432 F.2d 103, 105–106 (5th Cir. 1970). See also Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F. 2d 383, 392 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963); North Texas Producers Assoc. v. Young, 308 F.2d 235, 244–245 (5th Cir. 1962), cert. denied, 372 U.S. 929, 83 S.Ct. 874, 9 L.Ed.2d 733 (1963); Hughes v. Great American Indemnity Co., 236 F.2d 71, 75 (5th Cir. 1956), cert. denied, 352 U.S. 989, 77 S.Ct. 386, 1 L.Ed.2d 368 (1957). Neither the evidence nor the method of ascertaining damages arising from loss of vehicle tolls was unsuited for the purpose, and the trial court gave due weight to the variables appellant has noted. We find no error.

(2) *Passenger train revenue.* While Eads underwent repairs, passenger trains that normally used it to cross the Mississippi into St. Louis Union Station were shuttled by Terminal over the city's Municipal Bridge. The toll there incurred by Terminal was nearly twice the rate Terminal charged passenger lines for use of its own bridge. Terminal was entitled to the Eads tolls it lost. Canal, however, contends that Terminal was not the real party in interest to press such a claim because it had passed

on to the passenger lines the full city tolls. See Fed.R.Civ.P. 17(a). In connection with this real party in interest objection, Canal maintains that the District Court violated the parol evidence rule.

Evidence heard over Canal's objection revealed that unless the railroads themselves made Terminal's usage of Municipal Bridge necessary, Terminal billed, and the railroads expected to pay, the lower Eads toll whether a train crossed Eads or Municipal Bridge. This billing practice was said to be based on a course of dealing between Terminal and the railroads. The practice notwithstanding, Terminal passed on the full Municipal toll to its customers, because it was short of cash while Eads was out of service. The railroads paid under protest and with the expectation that they would be reimbursed the difference between the Eads toll ordinarily paid and the Municipal toll required of them. The evidence of course of dealing did not violate the parol evidence rule. Professor Corbin has stated the substance of the rule, which is one of substantive law and not at all of evidence, as follows:

When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing.

3 Corbin, Contracts § 573, at 357 (1960). This definition suggests two inquiries, the answers to which lead us to our conclusion that no infringement of the rule occurred: Did the parties assent to a writing as the complete and accurate integration of a contract between them? Regardless of the answer to the first question, is the evidence offered of antecedent understandings or is it of subsequent agreements? For, as Corbin epigrammatically states, "Today may control the effect of what happened yes-

terday; but what happened yesterday cannot change the effect of what happens today." *Id.* § 574, at 372. In order for a subsequent agreement to modify or discharge a contract made by the parties, it must itself comply with the requirements of a valid contract. *Id.* § 574, at 371 n. 12. However, when additional terms or provisions of an agreement can be proved by parol evidence, thereby showing that the written document in court is not a complete integration, "[i]t is not necessary that an additional promise shall have its own separate consideration, or that the additional terms shall be sufficient, quite apart from the document, to constitute a valid contract." *Id.* § 583, at 467–68. Decisions abound holding that such terms or provisions can be proved by parol evidence, "even though it is clear that the additional terms form a part of one contractual transaction along with the writing." *Id.* § 583, at 466–67. For a collection of some of these cases, see *id.* § 583, at 465 n. 88 (1960, Supp.1971).

Canal asserts that the court erred by permitting Terminal's witnesses to testify about a subsequent course of dealing in an attempt to alter, vary and change the unambiguous terms of the basic operating agreement between Terminal and its customer railroads entered into in writing on October 1, 1889. "Extrinsic evidence may be . . . helpful in deciding whether there has been an integration, and no rule bars 'parol evidence' or any other relevant evidence for the purpose of determining whether the parties have agreed upon the writing as a complete and accurate statement of what is agreed upon between them. Farmer v. Arabian American Oil Co., 277 F.2d 46 (2d Cir.), cert. denied, 364 U.S. 824, 81 S.Ct. 60, 5 L.Ed.2d 53 (1960); 3 Corbin §§ 573 & 582; Restatement of Contracts § 228 (1932)." Carolina Metal Products Corp. v. Larson, 389 F.2d 490, 493 (5th Cir. 1968). By concluding that Terminal was obligated to reimburse the railroads for the increased cost of Municipal Bridge that Terminal had passed

on to the railroads, the District Court impliedly found as a fact, and we think correctly, that the 1889 agreement was not a complete and accurate integration. We have not discovered any portion of the 1889 agreement that, even by means of contractual interpretation, arguably speaks to the allocation of toll costs between Terminal and the railroads, such allocation being the subject of the testimony to which Canal objected. Whether the course of dealing subsequent to 1889 sufficed to established a new contract supplanting the 1889 agreement or merely supplemented the existing written understanding by supplying a vital but missing term, evidence of it was properly heard and credited in the absence of contradiction. See, e. g., Franklin Research & Development Corp. v. Swift Electrical Supply Co., 340 F.2d 439, 443 n. 3 (2d Cir. 1964); Edward E. Morgan Co. v. United States, 230 F.2d 896 (5th Cir. 1953); Corbin, *supra*, § 556; cf. Uniform Commercial Code §§ 1–205, 2–202 (applicable to sale of goods).

▋ Due consideration for the evidence of course of dealing compels our conclusion that Terminal was the real party in interest with respect to claims for passenger train tolls. Rule 17(a)'s requirement that "[e]very action . . . be prosecuted in the name of the real party in interest" directs attention to whether the plaintiff has a significant interest in the particular action he has instituted. See 6 Wright & Miller, Federal Practice & Procedure: Civil § 1542, at 639 (1971). Its effect "is that the action must be brought by the person who, according to the governing substantive law, is entitled to enforce the right." *Id.* § 1543, at 643; see Gagliano ex rel. Gagliano v. Bernsen, 243 F.2d 880 (5th Cir. 1957); Young v. Powell, 179 F.2d 147, 150 n. 10 (5th Cir.), cert. denied, 339 U.S. 948, 70 S.Ct. 804, 94 L.Ed. 1362 (1950). As stated by the Advisory Committee in its Note to the 1966 Amendment to Rule 17(a).

[T]he modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to ensure generally that the judgment will have its proper effect as res judicata.

In the testimony concerning prior course of dealing and the explanation of the deviation therefrom, no suggestion emerged that there had been any change in relationship between Terminal and the railroads that would relieve Terminal of ultimate responsibility for the difference between its own and Municipal tolls. On the contrary, Terminal's comptroller testified, in line with the evidence of the past course of dealing, that his company had received protests and demands for repayment from several of the railroads. The evidence indicates a continuing legal obligation of Terminal to reimburse the railroads the difference between the tolls. Thus, Terminal was the party entitled to enforce the right to recovery.

■ (3) *Rerouting expense.* Since 1968 Terminal has maintained daily records of its usage of Eads Bridge and Merchants Bridge, both of which it owned, and Municipal Bridge, owned by the city of St. Louis and to which Terminal paid tolls. During the eight months that Eads was out of service, Terminal continued to maintain these records, indicating with an "Eads" notation each freight train which crossed the Mississippi via Municipal but which would have moved via Eads had that facility been available. Summaries of the records for this eight month period and for two comparable pre-accident periods were put in evidence to prove the increased usage of Municipal due to the unavailability of Eads. The District Court awarded losses attributable to freight operations on the record of the post-accident period, the period which produced the smallest award. Finding no fault with the method utilized to compute damages, Canal submits that the records underlying the summaries were inaccurate and thus the award was based on speculation. Bearing in mind what we have stated above regarding the degree of certainty required to prove damages, Canal's objection is not well taken.[9]

Canal attempted to discredit the accuracy of the records by demonstrating that trains in fact moving across Municipal but designated "Eads" on the post-accident records could not have utilized Eads in any event because the locomotives powering them were too large for that bridge. Terminal employees explained to the apparent satisfaction of the trial judge that trains were classified in the freight yards according to the bridge to be used, prior to assignment of a locomotive. Since Eads was shut down, it was unnecessary to assign engines small enough to move via Eads; thus, the fact that a train crossed Municipal under power of a locomotive too large for Eads did not necessarily establish that it was not an "Eads"-designated train.

Canal elicited testimony that even while Eads was open, Terminal's general manager had complained that the company was routing too much traffic over Municipal and had directed that every effort be made to reduce Terminal's usage of that bridge. The general manager explained, however, that the increased use of Municipal did not draw traffic away from Eads but from Mer-

9. Canal has noted in addition that no witness who testified about the three-bridge summaries had actual knowledge of train movements which the records purported to show and that the person who made the analysis and prepared the records was not present for cross-examination. We do not concern ourselves with these objections which relate primarily to the admissibility of the evidence, for Canal never objected to admissibility. In fact, Canal admitted in response to Terminal's Request for Admission of Fact that the records were prepared in the ordinary course of business, were maintained in the ordinary course of business, and were regular business records of Terminal, and it denied only the accuracy of the records.

chants, Terminal's other bridge. Terminal's witness admitted that at one point the bridge record showing an "Eads" movement over Municipal was wrong, but he added that "it's a normal busines record and nobody operates a business that doesn't have some errors made, . . . this is as good as any railroad record that you will find, and it's the sort of record upon which we pay our bills and on which we bill people on." There are other and similar examples of impeachment and rehabilitation. When all is said and done the choice of what evidence to credit belongs to the trier of fact. His findings of damages do not leave us "with the definite and firm conviction that a mistake has been committed." United States v. Oregon Medical Society, 343 U.S. 326, 339, 72 S.Ct. 690, 698, 96 L.Ed. 978, 988 (1952).

**(4)** *Repair costs.* The award of damages included the cost of repairs to Eads Bridge, without any reduction for depreciation. Findings were made that at the time of the collision the bridge was in sound condition, that it had a remaining useful life of an indefinite number of years, and that it had been fully depreciated in accordance with governing rates. Canal urges that the law requires a reduction of damages to account for depreciation and that the court erred in not trimming recoverable costs accordingly. See, e. g., Patterson Terminals, Inc. v. S.S. Johannes Frans, 209 F.Supp. 705 (E.D.Pa.1962). While we do not differ with Canal's statement of a general principle of damages, the application of that generality to the specific facts of this case requires no reduction for depreciation.

A party suffering injury to his property is entitled to no more than restoration to its condition prior to the wrong. See, e. g., The Baltimore, 75 U. S. (8 Wall.) 377, 19 L.Ed. 463 (1869); Tug June S v. Bordagain Shipping Co., 418 F.2d 306 (5th Cir. 1969); T. H. Browning Steamship Co. v. F. H. Peavey & Co., 235 F.2d 5, 8–9 (8th Cir. 1956).

As a practical matter, repair may leave property in a better condition. Depreciation, which in terms of a declining dollar figure reflects the annual depletion of an item's continuing usefulness for a given purpose, then becomes a handy tool to reduce the recovery for repair costs to the level necessary to return the injured party to the economic position in which he was found. Since the repairs neither enhanced the value nor extended the life of Eads, reduction of recoverable repair costs by depreciation previously taken would leave Terminal in a significantly worse economic position than before the accident. The case is similar to U. S. v. Pinckney, 150 F.Supp. 790 (S.D.Ga.1957), where depreciation was applied to reduce recoverable replacement costs of only those components of a demolished marker beacon having an ascertainable life. With respect to the component that the parties agreed had not and would not depreciate, the court made no reduction in recovery. As in *Pinckney*, no recovery less than the full repair costs will replace in the Eads Bridge value commensurate to its pre-accident worth.

In support of its position Canal has cited to us Brooklyn Waterfront Terminal Corp. v. International Terminal Operating Co., 211 F.Supp. 702 (S.D.N.Y.), aff'd per curiam, 311 F.2d 221 (2d Cir. 1962), Patterson Terminals, Inc. v. S.S. Johannes Frans, *supra*, and Jemison v. The Duplex, 163 F.Supp. 947 (S.D.Ala. 1958). In each of these cases the court found that the damaged or destroyed property had a definite life span which had partially elapsed at the time of the accident, or that repairs enhanced the structure's value beyond its prior worth, and reduced recovery accordingly. See also Rawls Bros. Contractors, Inc. v. United States, 251 F.Supp. 47 (M.D. Fla.1966); General American Transp. Co. v. The Patricia Chotin, 120 F.Supp. 246 (E.D.La.1954). The specific holdings of none of these cases purport to apply where repairs add no new value to the structure.

IV. Recovery due Mrs. Griffith.

Canal contends that the District Court erred by including in the computation of loss of future earnings a 2% per year cost of living increase, by failing to discount future earnings by taxes to be paid, and by setting the discount rate at 4% instead of a higher figure.[10]

In Cunningham v. Bay Drilling Co., 421 F.2d 1398 (5th Cir. 1970), a suit under the Jones Act and the general maritime law, we held that the court did not err in charging the jury that decreased purchasing power of the dollar is a proper element for consideration in determining the amount of tort award.[11] See also Grigsby v. Coastal Marine Serv., 412 F.2d 1011, 1042 (5th Cir. 1969), cert. dismissed, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970). We see no reason for a different rule when damages are determined by the court rather than by a jury. Therefore, the District Judge did not err in adjusting his computations by a 2% anticipated annual increase in the cost of living.[11B]

No deduction for income taxes should be made where annual estimated earnings are not clearly above the reach of the middle income scale. Blue v. Western Ry., 469 F.2d 487, 492–496 (5th Cir. 1972), petition for cert. filed 410 U.S. 956, 93 S.Ct. 1422, 35 L.Ed.2d 688 (1973) (No. 72–972); In re Marina Mercante Nicaraguense, S.A., 364 F.2d 118 (2d Cir. 1966), cert. denied, 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544 (1967); McWeeny v. New York, N. H. & H. R. R., 282 F.2d 34 (2d Cir.) (en banc), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960).[11C] The decedent's earnings of $11,321 during his last year of life do not exceed the range in which added exemptions or deductions would drastically affect tax liability. Thus any present attempt to adjust for future tax liability is too speculative to undertake. Compare Blue v. Western

10. The record refutes Canal's contention that the decedent's adult married daughter who was gainfully employed and receiving an allotment from her estranged husband was not entitled to any damages for her father's wrongful death. The evidence showed that she was dependent on her father for food and lodging.

11. Our independent examination of the briefs in *Cunningham* reveals that plaintiff produced an actuary who testified that the dollar could be expected to decline in value at an average annual rate of 2% over plaintiff's remaining anticipated worklife. In light of this testimony, *Cunningham* must be read as rejecting any logical or practical distinction between an instruction as to the dollar's present deflated value, which had been previously approved in New Amsterdam Co. v. Soileau, 167 F.2d 767 (5th Cir.), cert. denied, 335 U.S. 822, 69 S.Ct. 45, 93 L.Ed. 376 (1948), and an instruction as to future inflationary trends.

11B. In Johnson v. Penrod Drilling Co., 469 F.2d 897 (5 Cir. 1972, advance sheet ed.) a panel of this court reversed on procedural grounds the lower court's disposition of suits for personal injuries sustained on navigable waters, and remanded the causes for new trial. In its super-

visory capacity, the court stated that on remand "the triers of the facts should not be instructed to take into account future inflationary or deflationary trends in computing future lost earnings." Id. at 906. On petitions for rehearing and for rehearing en banc, the portions of the *Penrod* opinion concerning that subject matter have been withdrawn.

Prior to revision of Johnson v. Penrod Drilling Co. on petition for rehearing, this court in Crador v. Boh Bros., Inc., 473 F.2d 1040 (5th Cir. 1973), remanded a maritime action for personal injuries for redetermination of damages in light of *Penrod* and Blue v. Western Ry. The briefs in *Crador* show that none of the points of error raised on appeal concerned the adjustment of damages to reflect inflationary or deflationary trends. Consequently *Crador* does not conflict with the law of this circuit established in Cunningham v. Bay Drilling Co.

11C. This circuit also holds that a trial judge commits no error in refusing to instruct the jury that lump sum awards in personal injury actions are not subject to income taxation. See Greco v. Seaboard Coast Line R. R., 464 F.2d 496 (5th Cir. 1972); Prudential Ins. Co. of America v. Wilkerson, 327 F.2d 997 (5th Cir. 1964).

Ry., *supra* (anticipated annual earnings of $11,433, no deduction); In re Marina Mercante Nicaraguense, S.A., *supra* (anticipated annual earnings of $9,300 to $11,500, no deduction) with Hartz v. United States, 415 F.2d 259 (5th Cir. 1969) (anticipated annual earnings of approximately $65,000, deduction permissible in FTCA action); Cox v. Northwest Airlines, Inc., 379 F.2d 893 (7th Cir. 1967), cert. denied, 389 U.S. 1044, 88 S.Ct. 788, 19 L.Ed.2d 836 (1968) (anticipated annual earnings of $15,000 to $20,000, deduction permissible); LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266 (2d Cir.), cert. denied, 382 U.S. 878, 86 S.Ct. 161, 15 L.Ed.2d 119 (1965) (anticipated annual earnings of $16,000 and $25,000, deduction permissible).

■ As for the application of a 4% discount rate on future earnings, there was evidence that it would be possible to invest at a higher rate. But also there was evidence that Mrs. Griffith was not a sophisticated investor, and that, given the size of the fund and the need to invade principal periodically, fixed payment annuities (offered by established companies at maximum effective rates of interest of 4½%) would be her best investment. Under Blue v. Western Ry., *supra,* the applicable discount factor is a reasonable interest rate "over the period of the remaining anticipated work-life of the plaintiff," 469 F.2d at 497 (emphasis deleted), not the current yield on blue-chip corporate securities. The court did not err in choosing the 4% figure.

■ We reject the claim of Mrs. Griffith as cross appellant that the District Court should have decreased the lost earnings awarded as damages by a factor of 15% instead of 25% because the lesser figure more closely represented the deceased's personal consumption of his earnings. We have reviewed Mrs.

Griffith's testimony that her husband's personal upkeep accounted for approximately $150 per month, or approximately 15% of his earnings, against her other testimony detailing the family's expenses by categories. The District Court's finding that his needs accounted for $250 per month, or 25%, is not clearly erroneous.

■ We turn to the second and far more substantial contention raised on cross appeal. The action maintained for the decedent's survivors derives partially from Moragne v. States Marine Lines, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), which overruled The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358 (1886), and held "that an action does lie under general maritime law for death caused by violation of maritime duties." 398 U.S. at 409, 90 S.Ct. at 1792, 26 L.Ed.2d at 361. Mrs. Griffith contends that damages under the new maritime action for death caused by unseaworthiness include compensation for lost love and affection, which we have called "survivor's grief." Dennis v. Central Gulf S.S. Corp., 453 F.2d 137, 141 (5th Cir. 1972).[12] Relying by analogy on the Jones Act, 46 U.S.C. § 688, and the Death on the High Seas Act, 46 U.S.C. §§ 761–68, and rejecting as discordant with admiralty's quest for uniformity the suggestion that state law be borrowed, the District Court concluded that damages for survivor's grief could not be recovered in a general maritime action for death caused by unseaworthiness. For use in the event we disagreed, the District Judge found that the decedent's family would be entitled to $60,000 for lost love and affection, divided $20,000 to the widow and $10,000 to each of the children. Mrs. Griffith contends that the court erred in refusing to award these additional damages. We agree that survivor's grief damages are not recoverable in a general maritime action, although for somewhat dif-

12. This circuit recognizes a distinction between damages for loss of such measurable services as transportation and home repairs, and damages for survivor's grief.

See Dennis v. Central Gulf S.S. Corp., 323 F.Supp. 943 (E.D.La.1971), aff'd, 453 F.2d 137 (5th Cir. 1972).

ferent reasons than those given by the court below.

*Moragne* fashioned only the skeletal outline of a federal cause of action for death in state territorial waters caused by breach of general maritime duties. Resolution of ancillary questions, such as the applicable statute of limitations, the beneficiary scheme, and the measure of damages, was left to "await further sifting through the lower courts in future litigation." 398 U.S. at 408, 90 S. Ct. at 1792, 26 L.Ed.2d at 361. Today we articulate in part the elements of this still infant maritime death action. While indeed "[t]he channel here is as hard to find as the course of the Mississippi River," In re Sincere Navigation Corp., 329 F.Supp. 652, 654 (E.D.La. 1971), we are not entirely without markers. As the *Moragne* Court counselled, its overruling of *The Harrisburg* "does not require the fashioning of a whole new body of federal law, but merely removes a bar to access to the existing general maritime law" and thus "[i]n most respects the law applied in personal-injury cases will answer all questions that arise in death cases." 398 U.S. at 405–406, 90 S.Ct. at 1790, 26 L.Ed.2d at 360. In discussing questions regarding time limitations on suit and schedules of beneficiaries, the Court noted the possibility of clues in DOHSA, the Jones Act, and the Longshoremen's and Harbor Workers' Compensation Act. See *id.* at 406–407, 90 S.Ct. 1772, 26 L.Ed.2d at 360–361. For persuasive analogies in resolving "still other subsidiary issues . . . such as particular questions of the measure of damages," the opinion points to DOHSA and "the numerous state wrongful-death acts that have been implemented with success for decades." *Id.* at 408, 90 S.Ct. at 1792, 26 L.Ed.2d at 361.

█ *Moragne*, then, makes clear that both state and federal law are appropriate guides for those lower courts who must fill in the interstices of the general maritime death remedy. In post-*Moragne* cases this circuit has carefully followed the approach suggested by *Moragne*. For example, in Gaudet v. Sea-Land Servs., Inc., 463 F.2d 1331 (5th Cir. 1972), petition for cert. filed, 41 U.S.L.W. 3417 (Jan. 22, 1973) (No. 72–1019), we described our function in shaping the *Moragne* action in the following terms:

> [W]e have neither the intention nor the need to weave out of whole cloth a new suit in which to clothe this previously unrecognized cause of action; we have but to piece together the materials that are already available, *e. g.*, the general maritime law, personal-injury cases, state wrongful death statutes, and the Death on the High Seas Act, by a pattern that complements the purposes designed by the Supreme Court in *Moragne*.

*Id.* at 1332. Dennis v. Central Gulf S.S. Corp., 453 F.2d 137 (5th Cir. 1972), cert. denied, 409 U.S. 948, 93 S.Ct. 286, 34 L.Ed.2d 218, is another example of the approach to be employed. Citing analogies from state and federal law, the court allowed recovery for pain and suffering in a general maritime death action even though these damages are not recoverable under the Death on the High Seas Act.[13] Outside DOHSA, however, pain and suffering damages had been widely recognized as an appropriate element of recovery. For example, they had long been recoverable in personal injury actions under general maritime law, and they were generally recoverable in actions under state survival statutes brought by beneficiaries of mariners killed in state territorial waters. As the opinion further points out, they had even been awarded in DOHSA actions through the expedient of borrowing a state survival statute countenancing pain and suffering damages to supplement recovery under DOHSA. See Dugas v. National Aircraft Corp., 438 F.2d 1386 (3d Cir. 1971); Canillas v. Joseph H. Carter, Inc., 280 F.Supp. 48 (S.D.N. Y.1968).[14]

---

13. Dennis also upheld recovery of funeral expenses, which also are not recoverable under DOHSA. See 453 F.2d at 141.

14. An additional clue not mentioned in *Dennis* is that pain and suffering damages are recoverable in actions under the

The methodology for the "further sifting" contemplated by *Moragne* has thus been firmly established in this circuit. In shaping the new remedy we look first to existing maritime law, to which *Moragne* has allowed access in a death action. We next examine the remedial policies indicated by Congress in the federal maritime statutes. Heed to these statutes will assist in ensuring that "uniform vindication of federal policies" mandated by the *Moragne* Court. See 398 U.S. at 401, 90 S.Ct. 1772, 26 L. Ed.2d at 357. Finally we look for "persuasive analogies" in the state wrongful death acts. The importance of the role of these state acts is accented by their long and successful contribution to the growth of federal maritime law, and in their assistance in influencing the direction of admiralty law toward solution of contemporary maritime problems. See generally Gilmore & Black, Law of Admiralty § 1–16 (1957). To the extent that policies developed under state death remedies are applicable in a maritime context, then, those policies should influence the content of the new maritime death remedy.[15]

The policies manifested in those federal laws mentioned by *Moragne* point toward nonrecoverability of survivor's grief damages. First, under general maritime law, our primary referent, grief damages are not recoverable. Igneri v. Cie. de Transports Oceaniques, 323 F.2d 257 (2d Cir. 1963),

cert. denied, 376 U.S. 949, 84 S.Ct. 965, 11 L.Ed.2d 969 (1964), established that in actions under general maritime law to recover for personal injuries caused by both negligence and unseaworthiness, the spouse may not recover for loss of consortium, which was defined as "the mutual right of the marriage partners to each other's society, companionship, and affection, including sexual intercourse." *Id.* at 260 n. 2. Accord, Simpson v. Knutsen, O.A.S., 444 F.2d 523, 525 (9th Cir. 1971); In re United States Steel Corp., 436 F.2d 1256, 1278 (6th Cir. 1970), cert. denied sub nom. Lamp v. United States Steel Corp., 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971); Curry v. United States, 338 F. Supp. 1219, 1223 (N.D.Cal.1971); Smith v. Olsen & Ugelstad, 324 F.Supp. 578, 582 (E.D.Mich.1971); Valitutto v. D/S I/D Garonne, 295 F.Supp. 764 (S.D.N. Y.1969); Sanseverino v. Alcoa S.S. Co., 276 F.Supp. 894 (D.Md.1967). Second, suitors under DOHSA may recover only for pecuniary losses, which do not include survivor's grief. Igneri v. Cie. de Transports Oceaniques, *supra* at 323 F. 2d 266 n. 21; Middleton v. Luckenbach S.S. Co., 70 F.2d 326, 330 (2d Cir.), cert. denied, 293 U.S. 577, 55 S.Ct. 89, 79 L.Ed. 674 (1934); Peterson v. United N.Y. Sandy Hook Pilots Ass'n, 17 F. Supp. 676, 678 (E.D.N.Y.1936). Finally, suitors under the Jones Act cannot recover damages for survivor's grief. Igneri v. Cie. de Transports Oceaniques, *supra* at 323 F.2d 266; Savard v. Ma-

Jones Act, 46 U.S.C. § 688. See In re United States Steel Corp., 436 F.2d 1256 (6th Cir. 1970), cert. denied sub nom. Lamp v. United States Steel Corp., 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971).

15. In discussing the importance of state death acts, *Dennis* states: "As *Moragne* teaches, it would be anomalous for us to take away a pre-*Moragne* remedy which was almost universally available by the application of state survival statutes when there is no federal maritime policy against such recovery." 453 F.2d at 140. As this statement suggests, elements of recovery borrowed from

state death acts must be consonant with federal maritime policies. *Moragne* itself alludes to the importance of using the state experience in only a selective manner: "Our recognition of a right to recover for wrongful death under general maritime law will assure uniform vidication of federal policies, removing the tensions and discrepancies that have resulted from the necessity to accommodate state remedial statutes to exclusively maritime substantive concepts." 398 U.S. at 401, 90 S.Ct. at 1788, 26 L.Ed. 2d at 357.

rine Contracting, Inc., 296 F.Supp. 1171, 1176 (D.Conn.1969); Tate v. C. G. Willis, 154 F.Supp. 402, 403 (E.D.Va.1957); Gerardo v. United States, 101 F.Supp. 383, 385 (N.D.Cal.1951). The Jones Act, incorporating the Federal Employers' Liability Act, permits recovery only for pecuniary loss, which "does not include damages by way of recompense for grief or wounded feelings" or "losses which result from the deprivation of the society and companionship." Michigan Cent. R.R. v. Vreeland, 227 U.S. 59, 70–71, 33 S.Ct. 192, 196, 57 L.Ed. 417, 422 (1913).

The state guideposts to which *Moragne* refers are not so easily categorized. In In re Sincere Navigation Corp., 329 F.Supp. 652 (E.D.La.1971) (appeal pending, No. 72–2254), the court perceived a trend toward allowing recovery for survivor's grief under state death statutes and concluded that the maritime action for death should also permit such recovery. We are unable to agree that the trend in state law is sufficiently strong to override the policies against recovery manifested in federal law.[16]

The most persuasive state analogies should logically come from those pre-*Moragne* cases in which state death acts were borrowed to provide a maritime remedy for death caused by unseaworthiness.[17] For example, under the South Carolina, Virginia, and West Virginia statutes, mental anguish is an appropriate element of damages, and all three statutes have been construed to allow recovery for unseaworthiness.[18] The Maryland and Michigan statutes, which also have been construed to permit recovery for unseaworthiness, have recently been amended to provide damages for nonpecuniary loss.[19] Yet re-

16. We are indebted to Judge Rubin for the thorough research in *Sincere Navigation*, which has served as a key to our inquiry into the nature of recovery under the various state death acts.

17. Recovery for death caused by unseaworthiness is allowed under the statutes of the following states: California, Curry v. Fred Olsen Line, 367 F.2d 921 (9th Cir. 1966), cert. denied, 386 U.S. 971, 87 S.Ct. 1165, 18 L.Ed.2d 131 (1967); Louisiana, Grigsby v. Coastal Marine Serv., 412 F.2d 1011 (5th Cir. 1969), cert. dismissed, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970); Maryland, Maryland v. Nabella, 176 F.Supp. 668 (D. Md.1959); Michigan, Hunter v. Dampsk, A/S Flint, 279 F.Supp. 701 (E.D.Mich. 1967); New Jersey, Skovgaard v. The M/V Tungus, 252 F.2d 14 (3d Cir. 1957), aff'd, 358 U.S. 588, 79 S.Ct. 503, 3 L. Ed.2d 524 (1959); New York, Cunningham v. Rederiet Vindeggen A/S, 333 F.2d 308 (2d Cir. 1964); Oregon, Tallman v. Toko Kaium K.K. Kobe, 278 F.Supp. 452 (D.Or.1967); Puerto Rico (commonwealth), Compania Transatlantica Espanola, S.A. v. Torres, 358 F.2d 209 (1st Cir. 1966); South Carolina, Anthony v. International Paper Co., 289 F.2d 574 (4th Cir. 1961); Virginia, Holley v. The Manfred Stansfield, 186 F.Supp. 212 (E.D.Va.1960); West Virginia, Union Carbide Corp. v. Goett, 278 F.2d 319 (4th Cir.), cert. denied, 364 U.S. 826, 81 S.Ct. 64, 5 L.Ed.2d 55 (1960).

18. See 1962 S.C. Laws Ann. § 10–1954 [recovery for mental anguish allowed since Brickman v. Southern Ry., 74 S.C. 306, 54 S.E. 553 (1906), maritime law incorporated into statute with Anthony v. International Paper Co., 289 F.2d 574 (4th Cir. 1961)]; 1950 Va.Code Ann. § 8–636 [recovery for mental anguish allowed since Virginia Iron Coal & Coke Co. v. Odle's Adm'r, 128 Va. 280, 105 S.E. 107 (1920), maritime law incorporated into statute with Halley v. The Manfred Stansfield, 186 F.Supp. 212 (E.D.Va. 1960)]; W.Va.Code Ann. § 55–7–6 [recovery for mental anguish allowed since Kelley v. Ohio R. Co., 58 W.Va. 216, 52 S.E. 520 (1905), maritime law incorporated into statute with Union Carbide Corp. v. Goett, 278 F.2d 319 (4th Cir.), cert. denied, 364 U.S. 826, 81 S.Ct. 64, 5 L.Ed.2d 55 (1960)].

19. See Md.Code Ann. art. 67, § 4 [maritime law incorporated into statute with Maryland v. Nabella, 176 F.Supp. 668 (D.Md.1959), statute modified in 1969 (Md. Acts of 1969, ch. 352, § 1) to include damages for sentimental loss in the event of death of spouse or minor child]; Mich. Compiled Laws Ann. § 600.2922 [maritime law incorporated into statute with Hunter v. Dampsk A/S Flint, 279 F. Supp. 701 (E.D.Mich.1967), statute modified in 1971 (Mich. Laws Ann. § 600.2922 (Supp.1972), to provide for damages for loss of society and companionship].

search indicates that under none of these statutes have mental grief damages been awarded for maritime deaths, and construction of their liberal damage provisions in a maritime context remains undisclosed.[20] On the other hand, mental grief damages have often been awarded under state death acts for land-based torts,[21] but the differing rationales and factual circumstances underlying allowance of such recovery make difficult the extraction of policies applicable in a maritime context. For example, some courts have apparently upheld survivor's grief damages on the theory that punitive damages are recoverable under the state's wrongful death statute. See, e. g., Sloss-Sheffield Steel & Iron Co. v. Drane, 160 F. 780 (5th Cir. 1908); Leahy v. Morgan, 275 F.Supp. 424 (N.D.Iowa 1967). California recognizes psychic injury as an element of damages, but restricts recovery to parents who actually witness the negligently inflicted death of their minor child. See Dillon v. Legg, 68 Cal.2d 728, 69 Cal.Rptr. 72, 441 P.2d 912 (1968), overruling Amaya v. Home Ice, Fuel & Supply Co., 59 Cal.2d 295, 29 Cal.Rptr. 33, 379 P.2d 513 (1963). Occasionally liberal recovery under state wrongful death acts has been permitted without distinguishing between tangible loss of services and intangible grief. See, e. g., Louisville & N.R. Co. v. Whisenant, 214 Miss. 421, 58 So.2d 908 (1952)[22] Several state wrongful death statutes allowing recovery for survivor's grief limit the amount recoverable, e. g., W.Va.Code Ann. § 55–7–6, and at least one limits grief recovery to spouses and parents, Md.Code Ann. art. 67, § 4 (Supp.1972). And one court has upheld survivor's grief damages while denying damages for pecuniary loss. See Gregg v. Coleman, 235 F.Supp. 237 (E.D.S.C.1964).[23]

We conclude that the current rationales underlying recoverability for survi-

---

20. Searching for analogies in post-*Moragne* cases that apply state statutes in a maritime action may be unproductive. At least three cases hold that the *Moragne* remedy entirely supplants recovery under state law. See Hornsby v. Fish Meal Co., 431 F.2d 865 (5th Cir. 1970); Dennis v. Central Gulf S.S. Corp., 323 F.Supp. 943 (E.D.La.1971), aff'd, 453 F.2d 137 (5th Cir. 1972); In re United States Steel Corp., 436 F.2d 1256 (6th Cir. 1970), cert. denied sub nom. Lamp v. U. S. Steel Corp., 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971).

The current area of state law providing the most persuasive clues for effectuation of the maritime duty of unseaworthiness may be the law of strict products liability. Both strict products liability and liability for unseaworthiness are a species of liability without fault. Indeed, at least one commentator has suggested that Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), which extended the shipowner's duty to stevedores, represents acceptance by maritime law of the doctrine of MacPherson v. Buick Motor Co., 217 N.Y. 382, 111 N.E. 1050 (N.Y.1916), the forerunner of modern products liability law. See Stevens, Erie R.R. v. Tompkins and the Uniform General Maritime Law, 64 Harv. L.Rev. 246, 260 n. 77 (1951). The nature of recovery under state statutes for deaths caused by defective products is, however, as yet ill defined. A majority of states do not permit any recovery in death actions based on a theory of strict products liability. See Prosser, The Law of Torts § 95, at 652 n. 95 (3d ed. 1964). States that have permitted recovery for wrongful death caused by defective products have not yet defined the relationship between strict liability and recovery for mental anguish. See, e. g., Greco v. S.S. Kresge Co., 277 N.Y. 26, 12 N.E.2d 557 (N.Y.1938); Dagley v. Armstrong Rubber Co., 344 F.2d 245 (7th Cir. 1965). See generally Comment, The Application of Breach of Warranty to Wrongful Death Statutes: Conflict Between Archaic Legal Concepts and a Sense of Justice, 22 Baylor L.Rev. 384 (1970). See also Annot., Allowance of Punitive Damages in Products Liability Cases, 29 A.L.R.3d 1021 (1970).

21. *Sincere Navigation* cites 24 states as allowing recovery for psychic injury to beneficiaries in a death action. 329 F. Supp. at 652.

22. See note 12 *supra*.

23. The Restatement would allow recovery for unintentionally inflicted psychic injury arising upon harm to a third person only when the tortfeasor has placed the one suffering psychic injury in fear of bodily harm. Restatement (Second) § 313 (1965). See also *Id.* § 46.

vor's grief damages in state death actions are too divergent and ill defined to override the policies against recoverability manifested in general maritime law and in the federal statutes. This conclusion is not based on a mandate that the *Moragne* recovery be identical in all respects to general maritime law and to federal maritime statutes. Absolute uniformity is neither required nor desirable. Necessarily variations in proof, procedure, beneficiaries, and damages will affect the nature of recovery under various remedies and will cause the mariner to join alternative claims whenever possible.[24] Our conclusion results rather from measuring the federal policies manifested in the federal statutes and general maritime law against those policies expressed in the state experience and relevant to maritime problems. This is the methodology we perceive to be compelled by *Moragne* and followed by this court in at least four post-*Moragne* cases. See Futch v. Midland Enterprises, Inc., 471 F.2d 1195 (5th Cir. 1973) (No. 72–2900); Gaudet v. Sea-Land Servs., Inc., 463 F.2d 1331 (5th Cir. 1972); Dennis v. Central Gulf S.S. Corp., 453 F.2d 137 (5th Cir. 1972), cert. denied, 409 U.S. 948, 93 S.Ct. 286, 34 L.Ed.2d 218; Hornsby v. Fish Meal Co., 431 F.2d 865 (5th Cir. 1970).

While not crucial to our decision, we note that other circuits that have considered the issue have uniformly denied grief damages in a general maritime action. See Greene v. Vantage S.S. Corp., 466 F.2d 159 (4th Cir. 1972); Simpson v. Knutsen, O.A.S., 444 F.2d 523 (9th Cir. 1971); In re United States Steel Corp., 436 F.2d 1256 (6th Cir. 1970), cert. denied sub nom. Lamp v. United States Steel Corp., 402 U.S. 987, 91 S.Ct. 1649, 29 L.Ed.2d 153 (1971). District courts have divided on the issue. Compare In re Farrel Lines, Inc., 339 F.

Supp. 91 (E.D.La.1971); In re Sincere Navigation Corp., *supra*, with Mungin v. Calmar S.S. Corp., 342 F.Supp. 479 (D. Md.1972); Curry v. United States, 338 F.Supp. 1219 (N.D.Cal.1971); Green v. Ross, 338 F.Supp. 365 (S.D.Fla.1972).

V. Conclusion.

Affirmed in part; reversed in part; remanded for proceedings not inconsistent with this opinion.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before GODBOLD and RONEY, Circuit Judges and BOYLE, District Judge.

PER CURIAM:

The Petition for Rehearing filed on behalf of Mary K. Griffith, etc. is Denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is Denied.

The petition for rehearing filed on behalf of Canal Barge Company is Denied in all respects except with regard to the issue of whether the District Court erred by including in the computation of loss of future earnings a 2% per year cost of living increase. Action on that issue is withheld pending consideration by the court en banc of Johnson v. Penrod Drilling Company, 478 F.2d 1208 and Starnes v. Penrod Drilling Company, 478 F.2d 1208. The mandate in this case shall be stayed pending the further orders of the court.

The motion of Canal Barge Company to supplement the record in this case by addition of testimony given subsequently and in an unrelated case is Denied.

---

24. For example, under McAllister v. Magnolia Pet. Co., 357 U.S. 221, 78 S.Ct. 1201, 2 L.Ed.2d 1272 (1958), an injured seaman has alternative actions under the Jones Act for negligence and the general maritime law for unseaworthiness. The

*Moragne* Court indicated that the beneficiaries of a seaman killed in territorial waters could pursue recovery under either the Jones Act or the new maritime action for death. See 398 U.S. at 396 n. 12, 90 S.Ct. 1772, 26 L.Ed.2d at 354 n. 12.