James E. GRANTHAM, Sr., as Administrator of the Goods, Chattels and Credits of James E. Grantham, Jr., Deceased, Libelant,

v.

FISHING BOAT REDWING and The Quinn Menhaden Fisheries, Inc., Fernandina Beach, Florida, and J. W. Quinn, William E. Quinn, Augusta C. Quinn, and Robert L. Quinn, as Co-Partners doing business under the name of Quinn Brothers Fisheries, Respondents.

No. 1119.

United States District Court
E. D. South Carolina,
Charleston Division.

Sept. 16, 1964.

90

A. Arthur Rosenblum, Harvey M. Spar, Charleston, S. C., for libelant.

Harold A. Mouzon, Benjamin Allston Moore, Jr., Charleston, S. C., for respondents.

HEMPHILL, Chief Judge.

Libelant seeks recovery for alleged wrongful death of late member of the crew of Fishing Boat Redwing owned by the Quinn Menhaden Fisheries, Inc., remaining respondent.  Action is pursued

under the Jones Act[1] for the benefit of his parents, deceased being unmarried and twenty years of age at the time of his death on July 7, 1959.

On the day of demise the Fishing Boat Redwing, an 85.5 foot long fishing boat had, under the direction of its mate, put to sea to catch commercial fish, and upon its return was docked at respondent's wharf on a tidal river at Yonges Island, South Carolina. The Captain of the boat was away on personal business and the mate left the ship and went to the bunkhouse. Tied astern of the ship were two "purse" boats, one of which was known as the "Captain's boat", and the other known as the "mate's boat". Stretched between these purse boats was the net used in the day's catch which was being cleaned and prepared for the next day's operation.[2] It was the practice to take the net to one boat, clean it, clean out the empty boat and transfer the net back so the second boat could in turn be cleaned, and the net was then "salted" down. Six or seven of the crew, including deceased, after the first purse boat was being cleaned, went into the water

to wash off. Deceased went into the water, was carried by the tide, drowned. No showers or bathing facilities were aboard the ship, facilities were on shore.

The Redwing was an uninspected vessel subject to United States Coast Guard Regulations which required certain safety features.[3] The mate testified he had been ordered to "rig" the ship, asked for 24 life preservers, got none, saw only two aboard on July 7, 1959; only two life rings were aboard.

This Court is mindful of its authority and responsibility as a trier of fact where the facts are disputed.[4] There was dispute as to the equipment aboard and the Court finds as a fact that if there were life jackets aboard, they were not accessible, and the record reveals no knowledge on the part of the crew was had as to their whereabouts. No drills or instructions were given the crew, and no equipment was in either purse boat. At the time of the fatality neither Captain nor mate was supervising.

When it was evident Grantham was drowning one crewman threw a line

---

1. 45 U.S.C.A. § 51.

2. Respondent's answer raised the issue of "scope and course of employment" as to deceased, but this defense was later withdrawn.

3. "25.25–10 LIFE PRESERVERS AND OTHER LIFESAVING EQUIPMENT REQUIRED.
"25.25–10(a) All motor vessels shall carry an approved life preserver for each person on board. Motor vessels carrying passengers for hire shall also be provided with an additional number of approved life preservers suitable for children, equal to at least 10 percent of the total number of persons carried.
"25.25–10(b) All motorboats shall carry lifesaving equipment as follows:
with an approved life preserver for each person carried, and with an additional number of approved life preservers suitable for children, equal to at least 10 percent of the total number of persons carried.
"25.25–10(b) (2) Motorboats of Class 3 not carrying passengers for hire shall carry an approved life preserver or ring life buoy for each person on board.

"25.25–10(b) (3) Commercial fishing motorboats of Class 3 shall carry an approved life preserver, ring life buoy, or wood float for each person on board.
"25.25–10(b) (4) Commercial fishing motorboats of Class A, 1, or 2 shall carry an approved life preserver, ring life buoy, buoyant vest, buoyant cushion, or wood float for each person on board.
"25.25–10(b) (5) All other motorboats not otherwise specifically provided for shall carry an approved life preserver, ring life buoy, buoyant vest, or buoyant cushion for each person on board.
"25.25–10(c) All barges carrying passengers for hire shall be provided with an approved life preserver for each person carried, and with an additional number of approved life preservers suitable for children equal to at least 10 percent of the total number of persons carried when such barges are regularly operated with motorboats or motor vessels or steam vessels.
"25.25–15 STORAGE. 25.25–15(a) The lifesaving equipment on all vessels shall be so placed as to be readily accessible."

4. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed.2d 20.

which did not reach, another a life ring which fell short. Grantham grabbed another man who was unable to save him.

■ I conclude as a matter of fact that respondent was negligent in the following particulars:

(1) In allowing the crew to wash in the tidal river without supervision or proper equipment.

(2) In failing to have life saving equipment in the purse boats.

(3) In failing to have adequate accessible life saving equipment aboard the Redwing.

(4) In failing to instruct or inform the crew as to life saving equipment aboard and its use.

(5) In failing to properly supervise all work until its completion.

(6) In failing to follow and obey United States Coast Guard Regulations for uninspected vessels.

The Court finds as a matter of fact and law that the aforementioned acts of negligence were the sole cause of decedent's death.

The importance and the necessity of life saving equipment has been pointed out in Sadler v. Penn. R.R. Co. (4th Cir.): [5]

"An even stronger showing of negligence was made with respect to the failure of defendant to have adequate lifesaving equipment readily cannot be depended upon when men from which the attempt to rescue decedent was conducted and from which, in the nature of things, attempts to rescue men overboard would necessarily be made. One cannot escape the conclusion that the drowning of the decedent was a wholly unnecessary tragedy, and that, with decedent struggling in the water and calling for help and with a half dozen or more employees

trying to help him, he could have been saved if adequate lifesaving equipment had been at hand. As it was, men had to run half the length of the barge to obtain the heaving line, which was found to be inadequate when obtained. If there had been life rings or life preservers on the deck, they could and doubtless would have been seen and used, with every probability that their use would have resulted in saving decedent's life. The fact that there were life preservers in the crew's sleeping quarters and life rings on a hook on the bridge of one of the barges was not sufficient. They were out of the way and out of sight, twenty or more feet above the deck. They were not thought of in the excitement of the moment, whereas proper equipment on the deck would have been seen and used instead of the inadequate heaving line. * *

"[B]ecause memory and judgment cannot be depended upon when men are excited, it is of the utmost importance that lifesaving equipment be placed where it will be needed and where in case of the excitement of an emergency such as existed here it will not be overlooked."

■ This tragedy took place in territorial waters but such did not relieve the ship of the duty of due diligence in the effort to save its hapless crewman.[6] Due diligence would demand, indeed encompass, that proper lifesaving equipment be aboard. Diligence also demanded that the equipment be so placed on the vessel as to be ready for instant use when needed.[7]

Neither litigant asked for a jury trial as sanctioned in 28 U.S.C.A. § 1873, so the Court sits as a jury mindful of the test set forth in Ferguson v. Moore-McCormack Lines,[8] which cited Rogers v.

5. 159 F.2d 784.

6. Harris v. Penn. R.R., 4 Cir., 50 F.2d 866 and Gardner v. National Bulk Carriers, Inc. et al., 4 Cir., 310 F.2d 284.

7. Sadler v. Penn. R. R., supra.

8. 352 U.S. 521, 77 S.Ct. 457, 1 L.Ed.2d 511.

Missouri Pacific Railroad Co.,[9] as follows:

> "Under this statute [Jones Act] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."

Sitting as a finder of fact this Court determines the answer to be affirmative.[10]

██ It is well settled that the measure of damages in death actions under the Jones Act is based upon the pecuniary loss sustained by the beneficiaries. It has been held that this pecuniary loss is the amount which the beneficiaries could reasonably have expected to receive from a continuation of decedent's life. Moffett v. Baltimore & Ohio Railroad Co., (4th Cir.) 220 F. 39; Wade v. Rogala, 3 Cir., 270 F.2d 280. The earnings of the deceased as such are not of primary importance and are considered only as they bear upon the question of pecuniary assistance or contribution rendered by the deceased to the beneficiary. Holliday v. Pacific Atlantic SS Co., D.C., 117 F.Supp. 729.

█ The amount of damages for pecuniary loss must be divided into two parts: First, from the time of the death to the time of the ascertainment of damages; the second part embraces the financial loss reasonably expected in the future based upon reasonable life expectance. The first period is not subject to ascertainment of present worth. Holliday v. Pacific Atlantic SS Co., supra.

The testimony is that from 1954 until his death, the deceased had contributed an average of $20.00 per week to the support of his parents. I find that they could reasonably have expected to continue to receive this amount throughout their life expectancy.

While it is true that the deceased may have married and incurred additional obligations in the future, it is also true that since he was only 20 years of age at the time of his death, his earning capacity could reasonably have been expected to increase. In addition, as his parents grew older, they would become increasingly more dependent upon him.

I think it is reasonable to find and I do find that had young Grantham lived, he would, between the time of his death, July 7, 1959, and this date, a period of 62 months, contributed to his parents the sum of $20.00 per week for this 268 weeks, totaling Five Thousand Three Hundred and Sixty ($5,360.00) Dollars.

At the present time the deceased's father has a life expectancy of 26.81 years and his mother a life expectancy of 27.62 years. Utilizing annuity tables and a 4 per cent interest factor, I find the present value of the future losses to be Eighteen Thousand Three Hundred and Eighty-Eight ($18,388.00) Dollars.

█ The Libelant is also entitled to recover for any conscious pain and suffering sustained by the deceased. I find the sum of Two Thousand ($2,000.00) Dollars for this element of damages.

█ Libelant, therefore, will have judgment against the respondent for the total sum of Twenty-Five Thousand Seven Hundred and Forty-Eight ($25,-748.00) Dollars. Judgment will be entered accordingly.

The foregoing opinion constitutes my findings of fact and conclusions of law in accordance with Admiralty Rule 46½.

And it is so ordered.

9. 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493.

10. See Moore v. O/S Fram, D.C., 226 F.Supp. 816, Wilhelm Seafoods, Inc. v. Moore, affd. 5 Cir., 328 F.2d 868.