**Adolphus WILLIAMS, Plaintiff,**

v.

**NITTA KISEN K.K., LIMITED,
Defendant.**

**Civ. A. No. 71-H-248.**

United States District Court,
S. D. Texas,
Houston Division.

Oct. 12, 1973.

As Amended Dec. 6, 1973.

---

W. D. Bonham, Bonham, Davis, Carrington & Fox, Houston, Tex., for plaintiff.

D. Dudley Oldham, Fulbright, Crooker, & Jaworski, Houston, Tex., for defendant.

## MEMORANDUM AND OPINION

CARL O. BUE, Jr., District Judge.

### Statement of the Case

This is an action by Adolphus Williams to recover for damages for personal injuries sustained by him in the course and scope of his employment as a longshoreman aboard the SS FUSHIMI MARU, a vessel owned and operated by the defendant, Nitta Kisen K.K., Ltd., the shipowner. The action is based upon allegations of negligence of the shipowner and the unseaworthiness of the vessel.

A third-party action brought by the shipowner against Texports Stevedore Company, Inc., plaintiff's employer on the occasion in question, was dismissed prior to trial and is no longer an issue before this Court.

The cause proceeded to trial before the Court and after hearing the testimony of witnesses, considering the exhibits and depositions offered into evidence and hearing the arguments of counsel, the Court now makes and enters its findings of fact and conclusions of law. Fed.R.Civ.P. 52.

### Findings of Fact

*The Accident:*

1. On April 19, 1970, the plaintiff, Adolphus Williams, a resident of Houston, Texas, was employed by Texports Stevedoring Company, Inc., and at all material times was working in the course and scope of his employment as a longshoreman aboard the SS FUSHIMI MARU which was owned and operated by the defendant, Nitta Kisen K.K., Ltd., the defendant herein. The vessel was moored on navigable waters of the United States at the Port of Houston, Texas.

2. Plaintiff and his fellow longshoremen had reported for work at approximately 1 p.m. on April 19, 1970, but they were unable to go aboard the vessel until approximately 3 p. m., as the vessel was late in arriving at its berth.

3. Plaintiff and his fellow longshoremen were experienced longshoremen who were familiar with the procedures of discharging quantities of pipe from the holds of cargo vessels. It is the customary and standard practice in the discharge of pipe in the Port of Houston, Texas, that the longshoremen in the hold ordinarily determine under the existing circumstances the quantity and size of the loads of pipe to be broken out of any given stow in the vessel's hold.

4. Plaintiff and his fellow longshoremen were engaged in the discharge of lengths of pipe stowed fore and aft in the number 3 hold of the SS FUSHIMI MARU. Such pipe was estimated by the longshoremen with some variation as being roughly 10 inches in diameter and approximately 40 feet in length. There

was no evidence as to the weight of such pipe. There was proof that the pipe was covered with a somewhat greasy protective coating which was the normal condition of such cargo upon arrival. Each length of pipe was stowed directly upon other such pipe, there being no dunnage or other separation between them.

5. The longshore gang was following the customary practice in the Port of Houston, Texas, discharging pipe by means of a two-step process. The first step was to encircle the ends of several lengths of pipe with a "breakout wire" connected to the fall leading from the ship's winch. The ship's winch would then pick up one end of the encircled pipes and hold them stationary approximately three to five feet higher than the other end of such load which would continue to rest on the remaining stow. The second step required the placing of cargo discharge slings or "snorters" under the load which was then lowered onto such slings that, in turn, were secured to the fall leading from the shore side crane. The crane was thereupon operated to lift the load of pipe out of the hold and onto the dock.

6. The physical characteristics of the pipe in question routinely created an uneven and irregular stow in the hold, thus preventing the ends of these 40 foot lengths of pipe from being evenly aligned. At the commencement of breaking out operations, the longshoremen in the hold made the determination as to the quantity of pipe that the "breakout wire" would encircle. In order to prevent lengths of pipe which were embedded in the load, but not in direct contact with the "breakout wire", from falling out when the load was lifted, the longshoremen would frequently insert a suitable timber into the ends of such pipe so that the wood extensions would be caught and held by the "breakout wire". Occasionally, despite such precautions and unknown to the longshoremen, a pipe would not be caught securely by the "breakout wire", and such pipe would fall out when the load was raised.

7. The very nature of the discharge operation made it highly likely that wire slings could become somewhat bent and twisted during normal use, with the "eyes" at either end becoming elongated, pinched or even closed. Although there was testimony that two wire slings had broken on the same day prior to the accident in question, there was no persuasive evidence which indicated that the slings in use at the time of the accident were unusually twisted or otherwise defective.

8. According to the evidence, it is regarded as the safer practice to stretch the snorter under the raised end of the pipe load and then lower the load onto the snorter, thereafter connecting the snorter to the hook at the end of the crane fall with the pipe in a horizontal lowered position. However, it is not always practicable to utilize this procedure. First, in many cases the snorter as a consequence of routine use will kink and will not lie flat under the pipe as it is being lowered. Second, when a load of pipe is raised by the breakout wire, there frequently remains a sizable depression or "hole" in the stow into which the snorter may tend to drop. Third, occasionally when a load of pipe is lowered onto the snorter, there is a tendency for the pipe to spread or to "fan" or "broomstraw" as the breakout wire is slackened, thus making it difficult or even impossible for the snorter to be extended and thus secured to the fall of the crane. While it is desirable and prudent to step back some distance from the load in order to avoid the danger of falling or slipping pipe on each occasion, such precautions cannot always be followed precisely by those longshoremen whose duties include the securing and connecting of the snorter to the crane fall under such varied and uneven working surfaces in the hold.

9. As the work progressed, orders had been received by the longshore gang from their gang foreman and/or their walking foreman to discharge increas-

ingly larger loads of pipe from the hold. The evidence indicates that discharge was initially commenced with loads of 8 to 10 pipes, but that the load size was increased so that a number of loads contained between 15 and 20 pipes before the plaintiff's accident occurred. At the time of the accident, the preponderance of the evidence indicates that approximately 20 pipes were contained in the sling load being raised. This load was as large, if not the largest, load undertaken, either prior to or subsequent to the accident.

10. From a preponderance of the evidence, there emerges a pattern of overloading of the sling loads of pipe raised by means of the ship's winch at the number 3 hold of the SS FUSHIMI MARU on the date of the accident. Certain of the loads lifted previously as well as the load being lifted at the time of the accident exceeded the capacity of the ship's winch in use. As a consequence, it was necessary for the winch operator in lifting such loads to hold the control lever in a "cocked" position, that is, with the winch lever in the "advance" position so as to keep the wire drum from turning backward or "walking" the load back down. The evidence indicates that the winch had "walked" on several prior loads and that this "walking" was not a solitary, unforeseen and instantaneous occurrence. The evidence further indicates that this winch condition was brought to the attention of the gang foreman and the walking foreman and that they took no corrective action. Furthermore, such pattern of overloading was a direct consequence of the orders given by the gang foreman and/or the walking foreman to the longshoremen in the number 3 hold of the SS FUSHIMI MARU.

11. According to the more credible evidence, prior to and at the time of the accident, the plaintiff and his fellow longshoremen in the hold followed the instructions of their foremen concerning the size of the loads to be lifted. In all other respects they exercised reasonable care for their safety during unloading operations.

12. At the time of the accident, the plaintiff and longshoreman Smith were in the process of stretching or connecting the snorter around the end of a raised load consisting of some 20 lengths of pipe. As the winchman complied with the signal to lower the load, the winch began "walking", thereby causing at least one length of pipe in the load to slip out and roll onto the plaintiff's feet with resulting injuries.

13. Two days after the plaintiff's accident a survey of the winch in question was conducted by Russell Brierly and Associates, and the report of such surveyor has been introduced into evidence. The report concludes that:

In the opinion of the undersigned, the cargo winches and cargo gear, as far as now examined, are in excellent condition and the operation of these winches and cargo gear was entirely satisfactory.

The report does not indicate, however, if loads were increased at the time to determine the operational limits of the winch or what the winch's response was under overloaded conditions. Consequently, the report of the surveyor must be assessed within the framework of the testing conducted, there being no reference to size of load observed during winch operations at the time of the survey.

*Medical Facts:*

1. Immediately following the accident, the plaintiff was taken to Memorial Baptist Hospital where he was treated and examined by Dr. Charles L. Wolf, a general practitioner. While the plaintiff was under the care of Dr. Wolf, Dr. Robert H. Fain, an orthopedic surgeon, was called in to act as an orthopedic consultant. Dr. Fain first saw the plaintiff on May 9, 1970, and thereafter saw him several more times while he was in the hospital. Following discharge from the hospital on June 20, 1970, Dr. Fain saw the plaintiff an additional 14 times until released on Febru-

ary 10, 1971. Following his release by Dr. Fain, the plaintiff was referred by Dr. Wolf to Dr. John A. Murray, another orthopedic surgeon, who saw the plaintiff one time only, on March 11, 1971.

On April 6, 1971, Dr. Wolf released the plaintiff to return to work, it being reported that the plaintiff "has now reached his maximum improvement". On advice of counsel, the plaintiff saw an orthopedic specialist, Dr. Kermit Veggeberg, who has treated the plaintiff from March 30, 1971, to the present time.

2. The injury to the plaintiff's left foot was reported in the various medical records as involving substantial swelling, contusion and laceration. There were fractures of two distal phalanges. The foot has essentially healed. Dr. Fain and Dr. Wolf estimated no permanent disability to the left foot. Dr. Murray and Dr. Veggeberg estimate five percent permanent partial disability to the left foot. Dr. Veggeberg testified that in his opinion the plaintiff will suffer mild pain in this foot at times, otherwise suffering none. The record reasonably indicates and this Court finds that the plaintiff has suffered a five percent permanent partial disability due to injuries to the left foot.

3. The record indicates that the right foot sustained by far the greater injury, including substantial swelling, fractures, contusions and lacerations. The injury was described variously as a "degloving" or "declubbing" type. Dr. Fain estimated 25 percent permanent partial disability to the right foot. Dr. Murray estimated 15 percent permanent disability. Upon release, Dr. Wolf estimated a 40 percent permanent disability. Dr. Veggeberg estimated 50 percent permanent disability. The record reasonably supports and this Court finds that the plaintiff suffers 40 percent permanent partial disability to the right foot.

4. The medical records indicate that the plaintiff suffered substantial pain at the time of and following the accident. Nurse reports at Memorial Baptist Hospital amply reflect reports of pain and suffering. Dr. Veggeberg testified that in his opinion the plaintiff will always suffer mild pain, frequently suffering severe pain. Pain will increase with use of the foot.

5. Dr. Veggeberg reported that blood studies showed the plaintiff was suffering from mild gout, that part of his pain is attributable to the gout and that the plaintiff is continuing to take medication for its control. Such pain receives no consideration by this Court in reaching its findings and conclusions.

*Damages:*

1. Plaintiff's wages as a longshoreman for each of the four 12-month periods preceding the accident were as follows: (1) April 18, 1966, to April 17, 1967—$1,354.18; (2) April 24, 1967, to April 15, 1968—$2,406.49; (3) April 22, 1968, to April 14, 1969—$2,170.56; and (4) April 21, 1969, to April 19, 1970 (date of accident)—$3,540.27.

2. What emerges from the evidence adduced at the trial is a plaintiff who prior to injury on April 19, 1970, was only an occasional worker averaging approximately two work days per week at the waterfront. Taking into account all of the relevant circumstances, this Court finds that for purposes of calculating certain of the elements of damages, the 1969–1970 yearly earnings of the plaintiff ($3,540.27 which amounts to an average weekly wage of $68.08) are proper.

3. Lost wages from the date of injury, April 19, 1970, are calculated to the date of trial which approximates a span of 3½ years. This Court does so, since it is apparent from the preponderance of the medical evidence that the plaintiff no longer can obtain and retain employment at the docks as a consequence of his injuries. The Court finds such damages to be $10,915 ($3,540 x 3½ years).

4. With respect to diminished future earning capacity, the proof contained in the record of the trial is less than satisfactory. As previously indicated, the past work record of the plaintiff, when

viewed most favorably to him, is solely that of a sporadic dock worker. He has not worked since the accident. He is unmarried and has no dependents. As a practical matter, his physical condition precludes his undertaking the jobs regularly available to a non-union longshoreman. Yet, according to his own doctor, he is now "healthy as a horse" except for his feet. Although there is considerable variation of medical opinion as to when he reached the point of maximum recovery, the medical evidence is clear that he can do other, less strenuous types of work in the future.

The plaintiff is 42 years of age. Parties have stipulated to a life expectancy of 67 years. No evidence on work life expectancy was introduced, although such figure would not necessarily vary greatly in this instance from that of life expectancy. This Court has found a 40 percent permanent disability to the right foot and a 5 percent permanent disability to the left foot of the plaintiff as a consequence of the accident. There is no evidence introduced as to how such specific injuries translate into a loss of future wage earning capacity in this instance. This Court has concluded that the fairest method for calculating such damages in view of the inconsistent evidence as to when medical stability was reached is to assess a 25 percent loss of such wage earning capacity until such time as the plaintiff reaches age 67. Accordingly, the Court finds such damages to be $13,806 (25 years x $885 which is 25 percent of $3,540 discounted at 4 percent).

5. The medical evidence supports pain and suffering as a consequence of the accident, both in the past and in the future. Without engaging in extensive calculations, this Court finds the value of the total of such pain and suffering to be $9,500.

6. The medical evidence reveals that the plaintiff will need orthopedic shoes for the remainder of his life. The yearly cost of such shoes is uncontested and has been estimated at $100. The Court finds such damages to be $1,560 (25 years x $100 per year discounted at 4 percent).

7. The evidence in the case includes a current medical bill from Dr. Kermit Veggeberg totaling $338 of which $308 is related to treatment for this accident. Its reasonableness is not challenged. This is a proper item of damage.

8. The uncontested evidence further supports estimated future medical examination and treatment to amount to approximately $40 per year. This will be necessary for the balance of the plaintiff's life. This Court finds such damage to be $624 (25 years x $40 per year discounted at 4 percent).

9. The total of the above elements of damages, discounted where applicable, is as follows:

| | | |
|---|---|---|
| (1) | Lost wages in the past | $10,915 |
| (2) | Loss of future wage earning capacity | 13,806 |
| (3) | Pain and suffering | 9,500 |
| (4) | Current medical bill of Dr. Veggeberg | 308 |
| (5) | Future orthopedic expense | 1,560 |
| (6) | Future medical expense | 624 |
| | TOTAL | $36,713 |

### Conclusions of Law

#### I.

The Court has jurisdiction of this cause; venue lies in this District and Division; and all parties are properly before this Court.

#### II.

The plaintiff has failed to prove any negligence whatsoever on the part of the vessel, its master, officers and crew. *See, e. g.*, Slan v. A/A DET DANSKE–FRANSKE D/S, 479 F.2d 288, 289 (5th Cir. 1973).

#### III.

The SS FUSHIMI MARU is unseaworthy in the following particulars, each of which was a proximate cause of the accident in question: (a) the pattern of discharge operations ordered by the foremen and carried out by the longshore gang in and at the number 3 hatch of the vessel resulted in the overloading

of the sling loads of pipe being discharged onto the docks; (b) the overloads exceeding the capacity of the loading of such slings resulted in the ship's breakout winch, thereby causing the winch to "walk", both on several earlier occasions as well as at the time of plaintiff's accident. Thus, the use of otherwise seaworthy, non-defective equipment during cargo operations resulted in an unseaworthy condition due to a pattern of improper usage of the equipment by the longshoremen. *See* Crumady v. "Joachim Hendrik Fisser", 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Tucker v. Calmar Steamship Corp., 457 F.2d 440 (4th Cir. 1972); Adams v. United States, 393 F.2d 903 (9th Cir. 1968); Blassingill v. Waterman Steamship Corp., 336 F.2d 367 (9th Cir. 1964); Ferrante v. Swedish American Lines, 331 F.2d 571, 578 (3d Cir.), cert. denied, 379 U.S. 801, 85 S.Ct. 10, 13 L.Ed.2d 20 (1964).

## IV.

■ There is no persuasive evidence in the record of this case which brings into play the applicability of the doctrine of unforeseeable or operational negligence. *See* Usner v. Luckenbach Overseas Corp., 400 U.S. 494, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971); Robinson v. Showa Kaiun K.K., 451 F.2d 688 (5th Cir. 1971). *See also,* Robinson v. M/V Merc Trader, 477 F.2d 1331 (5th Cir. 1973).

## V.

■ There is no persuasive evidence, taking into account the overall nature of the cargo discharge operation as ordered and supervised by the gang foreman and walking foreman, that the plaintiff was contributorily negligent in his actions in the hold at the time of his accident. *See* Adams v. United States, 393 F.2d 903, 906 (9th Cir. 1968).

## VI.

■ Portions of the plaintiff's recovery representing prospective losses should be reduced to the present value of such future benefits. O'Connor v. United States, 269 F.2d 578, 585 (2d Cir. 1958); Mpiliris v. Hellenic Lines, Ltd., 323 F.Supp. 865, 895 (S.D.Tex.1970); Brooks v. United States, 273 F.Supp. 619, 633 (D.C.S.C.1967). In the present case the court has concluded that a discount rate of four percent (4%) should be applied to such benefits. *See* Canal Barge Co. v. Griffith, 480 F.2d 11, 29, 1973 AMC 843, 867 (5th Cir. 1973), limited rehearing en banc granted June 18, 1973; Grantham v. Fishing Boat Redwing, 234 F.Supp. 89, 93 (E.D.S.C.1964), aff'd, 344 F.2d 590 (4th Cir. 1965).

## VII.

It has been stipulated that out of any recovery that the plaintiff may obtain against the defendant, it shall be provided that Texas Employers Insurance Association, the compensation carrier, recover the total sum of $6,506.18 for benefits previously paid to plaintiff. Such stipulation is hereby incorporated into these findings and conclusions.

## VIII.

By reason of the foregoing findings of fact and conclusions of law, plaintiff is entitled to judgment against defendant in the sum of $36,713. To the extent that any of the foregoing findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the foregoing conclusions of law constitute findings of fact, they are adopted as such.

Counsel for the plaintiff will submit an appropriate judgment within twenty (20) days incorporating by reference these findings of fact and conclusions of law and providing for costs of court to be assessed against the defendant.